UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CRIMINAL ACTION NO. 5:23-CR-59-KKC-MAS

UNITED STATES OF AMERICA                                                                    PLAINTIFF

V.              **UNITED STATES' SENTENCING MEMORANDUM**

JONATHAN FITZGERALD CANNADA                                                  DEFENDANT

\* \* \* \* \*

This case arises from the Defendant's sexual exploitation of two minors, Victim A1 and Victim K. The Defendant (also referred to herein as "Cannada") first victimized Victim A1, a prepubescent minor who he met through the minor's mother, raping the minor approximately fifty times over the course of several years while also "sexting" her on a secret phone. The Defendant then moved on to fourteen-year-old Victim K—using a hybrid offline/online method to groom Victim K into a sexual relationship that resulted in the production of child pornography and Victim K's pregnancy.

The Defendant followed a similar modus operandi for each girl—selecting his victims from vulnerable families;[1] ingratiating himself to the victims' parents to gain access to the minors; acting like a father figure to the victims; creating opportunities to be alone with the victims; giving the victims secret cell phones to further groom them; sexually

---

[1] Each family faced socioeconomic difficulties; one family experienced parental health problems; and the other one-parent family had a history of involvement with social services.

1

assaulting the victims; threatening the victims' parents; and eventually gaslighting and/or blaming the victims and their parents.

As outlined herein, this Defendant is a serial offender and incorrigible pedophile. He presents a profound danger to society and should receive the maximum term of imprisonment of thirty years.

I. **Procedural History**

On June 1, 2023, a federal grand jury issued a ten-count indictment charging the Defendant with online enticement, child pornography, and obstruction offenses. On September 25, 2023, the Defendant pleaded guilty to Count 4 of the Indictment, alleging that the Defendant used a minor, Victim K, to engage in sexually explicit conduct for the purpose of creating a visual depiction of that conduct (i.e., production of child pornography) in violation of 18 U.S.C. § 2251(a). The offense of conviction carries a statutory penalty of not less than fifteen years and not more than thirty years of imprisonment. Accounting for the Defendant's credit for accepting responsibility, the United States Probation Office ("USPO") calculated the Defendant's offense level as 43 (adjusted from 44) and his criminal history category as III under the United States Sentencing Guidelines (hereafter, "guidelines" or "USSG"), resulting in a 360-month recommended term of imprisonment (adjusted from life to account for the statutory maximum of thirty years).

The Defendant objected to USPO's inclusion of a two-level enhancement under USSG §2G2.1(b)(5) relating to the victim being in the supervisory care, custody, or control

of the defendant. The United States responded to that objection on December 21, 2023. Although the United States believes the enhancement applies, its exclusion would not decrease the Defendant's recommended term of imprisonment of 360 months under the guidelines.

## II. The United States' Recommended Sentence

The United States requests a 360-month sentence of imprisonment followed by a lifetime of supervised release. As discussed in greater detail below, the sentencing factors outlined in 18 U.S.C. § 3553(a) support a maximum sentence for this Defendant.

### A. Nature and Circumstances of the Offense[2]

The Defendant pleaded guilty to Count 4 of the Indictment, alleging that he employed, used, persuaded, induced, enticed, or coerced Victim K to engage in sexually explicit conduct for the purpose of creating a visual depiction of that conduct.[3]

The Defendant engaged in a long campaign to groom[4]—i.e., induce, entice, and coerce—Victim K to achieve his goal of a sexual relationship. The Defendant started the

---

[2] The facts contained within this section are derived from the Presentence Report, Plea Agreement, KYIBRS reports, Facebook records, and Victim K's forensic interview. All of these sources have been provided to the Defendant through discovery or are otherwise available to him. Unless otherwise indicated by brackets, the United States has not altered direct quotes. Some direct quotes contain asterisks to indicate curse words; these asterisks were present in the underlying phone or Facebook records in their native formats.

[3] Because the offense of conviction does not involve Victim A1, the Defendant's conduct with that victim is discussed as part of his history and characteristics.

[4] Grooming "describe[s] a variety of behaviors that appear calculated to prepare a child for a future sexual relationship." *United States v. Fox*, 600 Fed. Appx. 414, 419 (6th Cir. 2015) (unpublished) (citations omitted). "The ultimate goal of grooming is the formation of an emotional connection with the child and the reduction of the child's inhibitions in order to prepare the child for sexual activity." *See Id.*

3

grooming process by befriending and gaining the trust of Victim K's parents, even moving into their home. The Defendant then enticed Victim K to spend time with him by offering to teach her about cars and taking her places. Because Victim K's father was in poor health, Victim K viewed the Defendant as a father figure.

At some point, the Defendant gave Victim K a secret phone and communicated with her regularly via text message and Facebook Messenger. This allowed the Defendant around-the-clock access to Victim K, resulting in hundreds of pages of text communications.

Victim K reported that, sometime around the end of 2020 and beginning of 2021, the Defendant began to manipulate her by threatening to kill himself—a fact that is corroborated by Facebook records.[5] According to Victim K, she sent the Defendant pictures to save his life. She said that the Defendant mostly requested pictures of her "parts down there" and she complied with the requests. The Facebook records contain multiple instances of the Defendant requesting sexually explicit images of Victim K, even telling her how to pose, and Victim K providing responsive material.

The sexual acts between the Defendant and Victim K also began occurring around this time period because, by March 2021, the Defendant sent Victim K messages about in-person sexual encounters and, by April 2021, he was asking her if she felt pregnant. For example:

---

[5] For example, on August 31, 2021, Cannada sent a message to Victim K on Facebook Messenger, stating: "Baby I just wanted to tell you I love you buttercup I thank you ever so much for loving me an saving my life I was going to truly [k]ill myself the day we first meat."

04-24-2021, starting at 22:24
- Cannada- Can i stretch it
- Victim K- Yes baby you can
- Victim K - How deep can I have it
- Cannada- IDK

04-25-21, starting at 22:05
- Victim K - Will you give us a baby
- Cannada- you have to do that I can't
- Victim K- your the only one that can knock me up cause of your sperm
- Cannada- I think we already are
- Victim K - Oh god I hope so
- Victim K - I really want a baby with you.

04-26-2021 at 13:46
- Cannada- Do you feel prego netted
- Victim K- Its pregnant and yes i do
- Cannada- Sweet you feel Prego netted
- Victim K- its pregnant
- Victim K- You Happy
- Cannada- Hell yes
- Victim K- why tho
- Cannada- Something thats us
- Victim K- yea it is

On at least two occasions, the Defendant used his smartphone to film himself engaging in sexual activity with Victim K at his foster father's Pulaski County residence.

As Victim K's parents became suspicious and attempted to limit the Defendant's time with their daughter, the Defendant began talking negatively about Victim K's parents in his messages to her, frequently threatening to report them to social services or otherwise harm them. For example:

03-06-2021
- Cannada- I'm really thinking about going to Social Services and just telling them what I've seen with my own two eyes
- Cannada- Your dad's the only reason why I haven't but now I don't know if our relationships enough to keep me from doing it after what he's done
- Victim K- ok but then i wont see you at all

> - Cannada- What does it matter she's done stop you from spending time with me anyways

In early August 2021, Victim K's parents learned that she was pregnant and law enforcement began investigating, causing the Defendant's threats to Victim K's parents to further escalate:

<u>08-14-2021</u>
- Cannada- I'm not going to stop until it happens I'm going to start calling social services and telling them lies on her
- Cannada- I want to have people call social services and tell lies on her as well

<u>08-10-2021</u>
- Cannada- I'm about to text your mom and tell her to run I'm coming for her the things I'm about to do to her will make the devil blush
- […]
- Victim K- Just please don't
- Victim K- Can I go to sleep for a bit please
- Cannada- Don't what do after a piece of s*** is trying to get me in trouble because of her know I'm about to come for her

<u>08-20-2021</u>
- Cannada- I'm on my way down to the VA now
- […]
- Cannada- Veteran Affairs where I have to go file charges against your mother
- […]
- Cannada- But she doesn't understand what she's doing with Serenity [a service dog] is federal time she will go to a federal prison

Although the Defendant frequently professed his love for Victim K, he also used coercive tactics to gain her compliance:

<u>08-20-2021</u>
- Cannada- If you want to leave it like this then I got you I will post pictures on Facebook do you got me
- Victim K- What pictures
- Cannada- You're about to find out do you want the pictures or do you want to pick the fuk up
- […]

- Cannada- Okay then pick up or lose me forever your choice
- Cannada- Okay then I'm deactivating Facebook now and I will shut my phone off this month goodbye

09-29-2021

- Cannada- I'm going to level with you on something Katie ever since you stopped actually calling me you made yourself look suspicious when I had to ever so beg you to give me a voice call I need it with all with messaging and then you start video calling me and up until our last video call when I seen someone in your f****** doorway you was video calling me now I ain't got s*** you swear up and down your dad's and f****** Mount Vernon Hospital there is no record of him ever being admitted I'm not playing with you no more who the fuk is it that you've not been telling me about I'm not f****** playing with you I will get in the goddamn car and I will give you every live location of every foot of every mile between here and there
- Cannada- Stop typing now until you hear my voice
- Victim K- I've been telling you about my dad
- Cannada- Now please as I asked
- Cannada- Now answer me you made yourself look suspicious. Me even though I begged you not to
- Cannada- Not me
- Cannada- You see this is what happens when you do the s*** you've done
- Cannada- I'm sorry your mother didn't tell you that but hey you learn as you go right
- Victim K- Not when you've been broken and trying to commit suicide
- Victim K- Just let me finish the job
- Cannada- Well that's on you okay I'm not doing this anymore after the last two nights I've spent yeah no enjoy your job
- Cannada- Is that what you want to hear
- Cannada- Or do you want me tell you go climb back in that motherfukers arms because I guarantee you I will spend life when I see him or is that what you want to hear

The Facebook records contain many hundreds of pages of sexually charged messages, threats, and manipulation from the Defendant. In addition to the sexually explicit visual depictions of Victim K, these messages tell the story of this crime, and that story is one of emotional torment.

7

This Defendant not only engaged in sex with a fourteen-year-old and produced child pornography of her, he also inflicted tremendous psychological cruelty upon her. This cruelty and manipulation resulted in Victim K both loving the Defendant (sleeping with a stuffed animal that he gave her as recently as March 2023) and being afraid of him. When these allegations first came to light, Victim K still wanted a life with the Defendant. Though Victim K now admits that she was manipulated and raped, the Defendant's spell on Victim K has not entirely lifted. For example, Victim K still believes many of the lies that he told her about his personal wealth and background. She also still wants to follow in his footsteps by becoming a Marine.

The Defendant's negative impact on this child will likely persist for many years: she will need to unlearn the negative things that the Defendant told her about her family and other witnesses in the case; she will need to unlearn the bad habits that she may have acquired from her first romantic relationship being with a manipulator; she will need to re-form a personal identity that does not reflect the Defendant's identity; and she will need to cope with the lifelong memory of her first sexual encounter being coerced and the emotional trauma of the resulting pregnancy.

B. History and Characteristics of the Defendant[6]

The Defendant's history and character fail to present any positive attributes that would justify a below-guideline sentence. Although the Defendant took the admirable step

---

[6] The facts contained within this section are derived from the Presentence Report, KYIBRS reports, restraining order records, and FBI Investigative Reports. All of these sources have been provided to the Defendant through discovery or are otherwise available to him.

of enlisting in the armed forces, he apparently received an other-than-honorable discharge for assaulting an officer. Otherwise, the Defendant's employment history is lackluster.

Following his discharge from the military, the Defendant engaged in assaultive and disorderly behavior in the civilian world—as shown by the string of arrests and convictions referenced in the Presentence Report.

However, the worst aspects of the Defendant's history did not result in any arrest or criminal conviction. The Defendant began raping Victim A1 when she was approximately seven years old and he continued raping her until she was approximately eleven years old. Although Victim A1's mother became suspicious of the Defendant and attempted to get a restraining order against him in 2017, Victim A1 did not report the sexual assaults until March 2021 (which actually led to the investigation relating to Victim K). The disclosure first occurred when Victim A1's aunt overheard conversations about sex at a sleepover. When the aunt asked the sleepover attendees if anyone had ever touched them in a sexual way, Victim A1 began to cry and disclosed that the Defendant had sexually assaulted her approximately fifty times. The aunt provided this information to Victim A1's mother ("Witness 1") and Witness 1 reported the information to law enforcement.

When SPD officers talked to Victim A1, she advised that the assaults typically occurred when she spent the night with the Defendant's daughters at his residence or at his father's residence. Victim A1 reported that the Defendant would typically wait until everyone else went to sleep, tell Victim A1 to remove her clothes and get in bed with him, and engage in digital penetration, oral sex, and vaginal penetration with Victim A1. Victim

9

A1 further reported that she was afraid to report the Defendant because he threatened to call social services on her mother and threatened to sexually assault her siblings.

On April 22, 2021, Victim A1 participated in a forensic interview at the Lake Cumberland Child Advocacy Center. The written summary of the interview indicates that Victim A1 was between the ages of four and seven when the Defendant began assaulting her and that it continued until she was eleven. She recalled that it continued until she was eleven because she remembered the Defendant attending her birthday party that year. Victim A1 again described various sexual acts performed on her by the Defendant, stating at one point that "[Cannada] would hold me down and rape me." She again reported being afraid that the Defendant was going to hurt her mother and that she complied with the Defendant to protect her mother. Victim A1 further reported that, at approximately age eleven, she had a pregnancy scare and that the Defendant put her on pills.

On February 24, 2023, FBI personnel met with Victim A1 and her mother, Witness 1. Victim A1 reported that the Defendant often sexually assaulted her when she was sleeping. Victim A1 advised that she was not certain if the Defendant created sexually explicit images of her, but she thought that he might have. She elaborated that the Defendant showed Victim A1 a picture of another minor female, Victim A2, sleeping with her pajamas pulled down, showing Victim A2's genitals. Victim A1 reported that the Defendant showed her the picture on his Samsung smartphone several years before.[7]

---

[7] Law enforcement did not locate this phone.

Victim A1 also reported that the Defendant gave her a secret phone with which to communicate with him. Victim A1 said that the Defendant would "sext" her using the secret phone and that he asked her to send sexually explicit images of herself. Victim A1 advised that she was too shy and embarrassed to actually create the images, but he often asked. Victim A1 said a typical request would involve the Defendant sending Victim A1 a picture of his penis and asking her to send a picture "like that." Victim A1 reported that these interactions occurred approximately when she was in fifth grade.

When asked if Victim A1 still had the secret phone, Witness 1 said the phone had been destroyed. Witness 1 said that she found the phone in approximately 2017 and confronted the Defendant about it, throwing the phone on the concrete and damaging it during the confrontation.

The Defendant denies the allegations relating to Victim A1, but many facts corroborate her account. For example, when law enforcement interviewed Victim A2, Victim A2 advised that she and Victim A1 had sleepovers at the Defendant's apartment and, during those sleepovers, the Defendant asked that Victim A1 and Victim A2 sleep only in their underwear. Further, screenshots submitted in support of a 2017 petition for restraining order show the Defendant making inappropriate statements to or about Victim A1, including:

> ➢ "[Victim A1] knows she's my soul"
> ➢ "tell [Victim A1] I'll keep my promise to her"
> ➢ "[m]y soul without you these places are so empty…I just love you…God I love you baby."
> ➢ "u wanted to become my soul[.] I was afraid at first but you wouldn't give up so I aloud you to become my soul[,] the best choice I ever made"

11

- ➢ "Hey sweetheart"
- ➢ "…you got me baby"
- ➢ "Do u still love me"
- ➢ "yes I know sweetheart…"
- ➢ "you should have kicked me in the ass honey"

The screenshots provided in support of the 2017 restraining order also corroborate that the Defendant threatened Witness 1, containing numerous examples of the Defendant threatening to call social services or law enforcement on Witness 1 and the Defendant telling Victim A1 that she is the only person who could stop it.

Meanwhile, one of the Defendant's social media accounts showed several pictures of Victim A1, including pictures of the Defendant cuddling with Victim A1—some with his shirt off and some in bed—and pictures of Victim A1 sleeping.

The similarities in the Defendant's grooming conduct between Victim A1 and Victim K also corroborate Victim A1's account—including the secret phone, the manipulation, and the threats to the victim's parents.

In addition to the Defendant's behavior with Victim A1 and Victim K, the Defendant also attempted to groom other minor females. For example, Victim A2 recalled an instance in which the Defendant said he had not been with a girl or woman in a while and then asked Victim A2 to sit on his lap. Additionally, University of Kentucky hospital personnel observed the Defendant cuddling a minor female who law enforcement later identified as Victim C. Although Victim C did not appear to be forthcoming about her interactions with the Defendant, she told law enforcement that the Defendant once told her that he wanted to have a baby with her.

### C. Just punishment

Production of child pornography is a serious offense that targets the most vulnerable in society, causing long-lasting, serious impacts on child victims. The offense "harms and debases the most defenseless of our citizens." *United States v. Pelloski*, 31 F. Supp. 3d 952, 959 (S.D. Ohio 2014) (cleaned up). These offenses "result in perpetual harm to victims and validate and normalize the sexual exploitation of children." *Id*. (*quoting* United States Sentencing Commission, Child Pornography Report, at vi). "Defendants convicted of the production of child pornography are the most culpable of the child pornography offenders" and "are, without question, deserving of lengthy sentences of imprisonment given the direct and lasting harm they inflict upon children." *Id.* at 954.

### D. Deterrence

The Supreme Court has noted "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class..." *Smith v. Doe*, 538 U.S. 84, 103 (2003). Research in this field is "consistent with what judicial decisions show: pedophiles who have sexually abused children are a threat to continue doing so, and age does not remove the threat." *United States v. Irey* , 612 F.3d 1160, 1214 (11th Cir. 2010)(citing various studies and reports); *see also United States v. Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008) ("sex offenders have appalling rates of recidivism and their crimes are under-reported."); *United States v. Allison*, 447 F.3d 402, 405–06 (5th Cir. 2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders.").

This Defendant, a serial offender with a years' long sexual interest in children, fits

within the aforementioned dangerous class of offenders and requires specific deterrence.

"General deterrence is [also] crucial in the child pornography context." *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010). *See also United States v. Bistline*, 665 F.3d 758, 767 (6th Cir. 2012) (reversing the district court for neglecting the importance of deterrence in a sentencing for possession of child pornography). The amount of CSAM on the internet has reached epidemic proportions.[8] Meanwhile, predators who seek to groom children into sexual relationships also increasingly use the internet to facilitate their crimes.[9] Because of this proliferation of child pornography and the expanding use of internet technologies to exploit children, a deterrent message must be sent to other would-be child groomers and producers of child pornography. *See, e.g.*, *United States v. Widmer*, 511 F. App'x 506, 511 (6th Cir. 2013) ("sentence was necessary to send a signal to would-be offenders that receipt of child pornography carries significant consequences").

### E. Protection of the Public

"[P]rotection is a function of two variables: the level of risk that conduct will occur and the level of harm that will be inflicted if that conduct does occur." *United States v. Irey*, 612 F.3d 1160, 1217 (11th Cir. 2010). Because the Defendant is a persistent child predator who presents a high risk of recidivating, he poses a particular threat towards the public.

---

[8] *See* Michael H. Keller and Gabriel J.X. Dance, *The Internet is Overrun with Images of Child Sexual Abuse. What Went Wrong?*, N.Y. TIMES, Sep. 29, 2019. Available at https://www.nytimes.com/interactive/2019/09/28/us/child-sex-abuse.html (last accessed August 7, 2023).

[9] *See e.g.,* Tatiana R. Ringenberg et al., *A Scoping Review of Child Grooming Strategies: Pre- and Post-Internet*, 123 Child Abuse and Neglect (2022).

### F. Unwarranted Sentencing Disparities

"[T]he Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). *See also United States v. Boucher*, 937 F.3d 702, 708 (6th Cir. 2019) ("To avoid sentence disparities, the Guidelines provide a transparent and predictable sentencing range for defendants who fall within the 'heartland' of average cases 'to which the Commission intends individual Guidelines to apply'"). The imposition of a guideline sentence of thirty years in this case thus avoids unwarranted sentencing disparities.

## III. Restitution

Unless the Defendant and the United States are able to negotiate a restitution figure before sentencing, the United States requests an additional ninety days within which to resolve the matter of restitution, pursuant to 18 U.S.C. § 3664(d)(5).

## IV. Conclusion

This Defendant committed a serious child sex offense. Because the Defendant has engaged in a pattern of child exploitation over the course of several years, he likely poses an increased risk for reoffending. These and the other sentencing considerations outlined herein support the imposition of a guideline sentence of thirty years and a lifetime term of supervised release.

Respectfully submitted,

                                      CARLTON S. SHIER, IV
                                      UNITED STATES ATTORNEY

By:   s/Mary L. Melton
        Assistant United States Attorney
        260 W. Vine Street, Suite 300
        Lexington, Kentucky 40507-1612
        (859) 685-4802
        Mary.Melton@usdoj.gov

## CERTIFICATE OF SERVICE

On February 14, 2024, I electronically filed this response through the ECF system, which will send notice of docket activity to defense counsel.

                                      s/ Mary Lauren Melton
                                      Assistant United States Attorney